## MATEAS v. FRED HARVEY.

### No. 10783.

Circuit Court of Appeals, Ninth Circuit.

Jan. 12, 1945.

Walter Gould Lincoln, of Los Angeles, Cal., for appellant.

Schell & Delamer, of Los Angeles, Cal., for appellee.

Before DENMAN, STEPHENS, and HEALY, Circuit Judges.

STEPHENS, Circuit Judge.

Plaintiff-appellant brought action against appellee for damages for personal injuries incurred when he fell from a mule belonging to appellee, herein called the Corporation. The complaint was originally filed in the Superior Court of California, but the case was removed to federal court because of diversity of citizenship. Trial was had without the aid of a jury under a stipulation to that effect. At the close of plaintiff's case the court granted defendant's motion to dismiss, and plaintiff appeals.

There is competent evidence to the following effect:

For many years, including the time material herein, the Corporation has maintained a resort hotel on the south rim of the Grand Canyon in Arizona. Transportation of both men and goods from the south rim into the Canyon is by mule over one of three trails, called the Bright Angel, Kaibib, and Yankee trails.

Mules to be employed on the steep, narrow trails of the Canyon are used for one or two years as pack animals, although the packer rides different ones of them back up the trails. When the packer and trail foreman think the mules suitable for such use, they are ridden by guides until considered safe enough to be ridden by persons desiring to go on excursions into the Canyon. The excursion groups are limited to ten persons, and each is led by an experienced guide. The trail foreman and the guide assign mules to riders according to poundage capacity of the mounts.

Appellant and his wife, while at the hotel, read and believed a circular gotten out by the Corporation, in which was printed the following: "Trail Trips Into the Canyon. Although visitors may venture short distances down these trails on foot, the accepted mode of travel for longer journeys is by the famous Grand Canyon mules. These faithful, sure-footed animals, in charge of experienced guides, hold a 30 years' record of carrying many thousands of inexperienced riders down the trail and back in perfect safety." Appellant inquired at the ticket booth in the lobby of the hotel about the mule excursion and remarked that he had never ridden a mule or a horse before. He was told by the clerk that most of those who took the mule trips were inexperienced riders. Thereupon, appellant bought tickets for himself and wife.

Appellant and his wife were assigned to a group of seven, and started down Bright Angel trail to the Corporation's "Phantom Ranch" near the base of the Canyon. An experienced guide was in the lead, appellant's wife was about in the middle, and appellant was, according to the guide's direction, riding on "Chiggers," the rear mule of the string of seven. Chiggers had been used as a pack and guide mule in the Canyon for two years before he became part of the "dude" string, and for the next two years he carried riders. However, the trip here under attention was the first time he had been up or down a trail since spending the winter months in pasture. The other riders in appellant's group let their reins hang from the saddle horns, but appellant was instructed by the guide to hold the reins in his hands at all times.

On the ride down the trail Chiggers tried several times to squeeze past the mule ahead on the outside or precipice side of the trail. After about two or three hours the caravan stopped for rest and luncheon at a camp called Indian Gardens. Upon resuming the journey appellant changed mules with an experienced rider, but after explaining to the guide that he could not handle Chiggers, he was required to remount and proceed on that animal. Almost immediately Chiggers took up his old trick of pressing forward. In a half hour or so, while Chiggers was pressing the mule ahead, appellant reined him back, and Chiggers started bucking, throwing and seriously injuring appellant.

It is not entirely clear from the complaint upon what theory appellant bases his action. Following certain background matter he alleges that he paid the fee for the trip into the Canyon by the Bright Angel trail; that the string of mules provided for the persons taking the trip were under the sole control, charge, and management of the guide who was an employee of the Corporation; that a mule named Chiggers had never been up or down the Bright Angel trail and had never carried excursionists until the day of the accident and that appellant knew none of these facts concerning the mules; that appellant informed the Corporation of his total inexperience as a rider; that the mule Chiggers was selected for him to ride; that he rode at the end of the string of mules; that the Corporation knew, or should have known,

the mule was unsuitable for the purpose involved and was not safe to be ridden by an inexperienced rider; and that some distance down the trail the mule bucked and threw appellant off his back to appellant's injury. During the course of the trial appellant's attorney emphasized the point that the action was not based on the theory of negligence, but rather on the theory of breach of warranty that the mule was safe and fit for the purpose involved. However, as is said in Smith v. Pabst, 233 Wis. 489, 288 N.W. 780, 784, "It appears that there is little, if any, distinction in the applicable law, whether the action is grounded upon implied contract or warranty or upon negligence."

In Kersten v. Young, 1942, 52 Cal.App.2d 1, 125 P.2d 501, at page 504 is stated the following: "We may affirm a judgment of nonsuit only when, from a review of the evidence, we can say that, disregarding the fact that there may be a conflict therein, and giving full credit only to that portion of the evidence, whether produced by plaintiff or defendant, which tends to support the allegations contained in plaintiff's complaint, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict for plaintiff if such verdict were given. * * *"

■ The accident to appellant took place in the State of Arizona, and the law of that state governs, although, probably because all parties assumed that the applicable law of Arizona and California is the same, the court tried the case upon California law. No references to the law of Arizona are included in the briefs filed herein, and we find no Arizona authority exactly in point.

The cases relied on by both appellant and appellee, and which, at first blush, appear to be applicable, are for the most part the "livery stable" cases.

Cousino v. Huss, 1942, 71 Ohio App. 107, 47 N.E.2d 919, at page 920: "While plaintiff's petition reads like a petition in tort, she insists upon and tried her case as one upon at least an implied warranty, a bailment; not, of course, of some chattel like a wheelbarrow or an automobile or other machine which might be examined by the bailee for faulty parts, but an animal, a horse, and a very young horse at that.

"The rule of law to be applied to the defendant in the conduct of his business is stated in an extensive note in 12 A.L.R. 774, to which reference is made by the Ohio Supreme Court in Troop A Riding Academy v. Miller, 127 Ohio St. 545, 189 N.E. 647, 649, a tort case where plaintiff fell from a saddle horse. The rule is, as there announced, that:

" 'Livery-stable keepers who let animals for hire are bound only to exercise ordinary care and diligence in providing an animal suitable for the purpose for which it is hired.' "

Hahn v. Rockingham Riding Stables, 126 N.J.L. 324, 19 A.2d 191, 192: " * * * From this [a corporation in business of hiring riding horses] it followed that the relationship of bailor and bailee, on this contract of hire, came into being between the parties and that the bailor impliedly warranted the horse as being fit for the purposes for which it was hired. * * *"

Kersten v. Young, 1942, 52 Cal.App.2d 1, 125 Pac.2d 501, at page 503: "At the outset it should be noted that in a contract of hiring with one who rents horses for riding purposes, in the absence of any notice to the contrary there is contained an implied warranty to the rider that the renter of the animal knew or had exercised reasonable care to ascertain the habits of the horse and that the animal was safe and suitable for the purpose for which the keeper hired the horse to the renter thereof. To inform himself of the habits and disposition of horses which he keeps at his stable for hire is the duty of a stable-keeper, and if he knows or in the exercise of reasonable care should ascertain the fact that his animals are dangerous or unsuitable, he is liable for injuries to his customers resulting from the vicious propensities of animals so hired to his customer. Dam v. Lake Aliso Riding School, 6 Cal. 2d 395, 399, 57 P.2d 1315."

Conn v. Hunsberger, 1909, 224 Pa. 154, 73 A. 324, at page 325, 25 L.R.A., N.S., 372, 132 Am.St.Rep. 770, 16 Ann.Cas. 504: " * * * It is the duty of a livery stable keeper to inform himself of the habits and disposition of the horses which he keeps in his stable for hire, and if he knows that they are dangerous and unsuitable, or by the exercise of reasonable care could ascertain the fact, he is liable for any injuries to his customers resulting from their vicious propensities. The law will not permit him to close his eyes and his ears, thereby

remaining ignorant of the vicious habits of his horses, and relieve him from liability for injuries to a customer resulting from such habits. In his contract of hiring he impliedly engages that he knows, or has exercised reasonable care to ascertain, the habits of his horses, and says to his customer that the horse which he lets is safe and suitable for the purpose for which he has hired it. His warranty is against defects or vicious habits, which he knows, or by the exercise of proper care could know; and, if he fails to exercise such care, and it occasions injury to his customer, he will not be relieved of liability, though he did not actually know the horse was unsuitable for the service. It is true a liveryman is not an insurer of the suitableness of a horse or carriage let to a customer, but he is bound to exercise the care of a reasonably prudent man to furnish a horse or carriage that is fit and suitable for the purpose contemplated in the hiring. * * *"

The California Supreme Court adopted the language quoted from Conn v. Hunsberger, supra, in the case of Dam v. Lake Aliso Riding School, 1936, 6 Cal.2d 395, 57 P.2d 1315, 1318, and explained: "* * * Under this rule the so-called implied warranty is not a warranty in that sense which insures the suitableness of the horse, but is only a contractual obligation assumed against reckless or heedless hiring out of a horse without reasonable care to ascertain the habits of the animal with respect to its safety and suitability for the purpose for which it is hired."

Foley v. O'Flynn, 1934, 288 Mass. 504, 193 N.E. 44, 46: "His duty [stable keeper] was to use reasonable care to furnish a suitable pair of horses for the journey, having in mind all the existing and foreseeable conditions."

Parker v. G. O. Loving & Co., 1913, 13 Ga.App. 284, 79 S.E. 77, 78: "What would be ordinary care depends upon the particular business in hand, the circumstances surrounding the particular transaction, and the situation of the parties."

Hahn v. Rockingham Riding Stables, 126 N.J.L. 324, 19 A.2d 191, 193: "* * * On this showing appellants were not entitled to a nonsuit, it being clearly deducible that a prima facie case of breach of implied warranty of fitness of the horse for the purpose for which it was hired was made out against appellants. Even though reasonable minds could differ as to this conclusion, a motion for nonsuit is properly denied. * * *" '

We also direct attention to a case which is very close in fact to the instant one. Vaningan v. Mueller, 1932, 208 Wis. 527, 243 N.W. 419, at pages 420, 421: "The contention that there was no evidence to take the case to the jury cannot be upheld. It is based on the idea that the plaintiff was thrown by the horse's bucking, and it was never known to buck before, and that as a dog, before the statutory enactments changing the common-law rule as to scienter was entitled to its first bite, a horse is entitled to its first buck. We cannot agree to this proposition as applied to a horse let out by a liveryman for hire." "* * * The complaint is so worded as to state a case on contract or in tort for negligence, and supports submission on either theory. * * *." [Here follows a discussion of both theories with citations supporting each.] The court then said: "* * * In none of the cases above cited, whether conceived as on contract or in tort, was it considered necessary to prove knowledge of the evil propensities causing the injury, failure to prove which forms the basis of defendant's claim that a verdict should have been directed in his favor. * * *"

■ Here, appellee seeks by printed circular to paint the trip down the narrow trails into the Canyon as one to be enjoyed. It is emphasized in the circular that the corporation's animals have been selected and trained so as to carry excursionists with safety. The circular is at once an invitation and inducement for the sightseer to pay the fee, trust in appellee's representations, and take the trip for pleasure. Thus, appellee, for hire, assumes a responsibility.

The corporation which rented the animal for this particular use was bound to know that the experience by one unused to trail riding and looking over and down a precipice would likely be disturbing and frightening. It was bound to know also that an inexperienced rider pulling at the reins of a mount fresh from an extended freedom from restraint would likely excite the mount and this in a dangerous locale. Further, the corporation knew through its guide that prior to the accident the mount was not acting as a well-trained string animal, and that the rider was having trouble in managing him. Notwithstanding this, the guide kept appellant on the unruly

mule and kept the mule in the rear, while the guide rode on in the lead, too far, of course, adequately to observe the progress of this one unruly animal in his string, and too far away to go to plaintiff's assistance in case of need.

■ As has been seen, there is much refinement in the cases upon the various theories of recovery, but we think there was evidence of the lack of due care upon the part of the corporation. The case was tried by the court without the aid of a jury and was dismissed at the conclusion of the plaintiff's case. No findings of fact were made, and it is apparent that the court, as a matter of law, regarded the evidence introduced as neither a possible basis for an inference of negligence or of a warranty violation on the part of the corporation. In ruling upon the motion to dismiss, the court said: "I am always reluctant to do that [to dismiss at conclusion of plaintiff's case so as to adjudicate on the merits] despite the fact that in our Federal Courts we are not bound by the scintilla of evidence rule which the Supreme Court of California has promulgated in many cases, which makes it almost impossible to ever sustain a non-suit, unless there is an absolute failure of proof, as it were. We have never followed that, but the rule we say is if there is any substantial evidence to—that there must be substantial evidence before the court will put a defendant upon his proof whether the case is tried · by the court alone, sitting without the jury, or with the jury, and *if there were any kind of an inference that could be drawn from this record, I would put on the proof, I would put the defendant on his proof so as to decide the matter upon the basis of the entire story as narrated to me by all of the parties concerned, but it would be just a waste of your time, and my time, because the record absolutely shows no basis for liability.* [Emphasis added.]" See Federal Rules of Civil Procedure, Rule 41(b), 28 U.S.C.A. following section 723c. This judicial comment is in effect a finding that the evidence adduced, taken at its face value, cannot support an inference either of negligence or of a violation of warranty. The last and concluding thought in the comment is " * * * the record shows no basis for liability." This ruling, as would be a formal finding to the same effect, is clearly erroneous. See Federal Rules of Civil Procedure, Rule 52(a).

The judgment is reversed and the case is remanded for a new trial.

DENMAN, Circuit Judge (concurring).

I agree that on the uncontradicted evidence stated in the majority opinion any finding other than of appellee's negligent failure to perform an assumed obligation would have to be set aside as "clearly erroneous" within Federal Rules of Civil Procedure rule 52(a).

In breaking to saddle animals living solely on range pasture, their wild power of resentment is well known. After breaking and apparent docility, long periods with range freedom, as in this case, well may renew that resentment on the animal's first saddling thereafter. The recalcitrancy of the mule to the pressure of human direction has been the theme of poesy and prose of Army teamsters and pioneer "mule skinners." To the bucking resistance of an aggrieved mare is added the kicking obstinacy of its paternal ass.

That appellee knew appellant's mule required exceptional treatment is evidenced by the fact that appellant was required by appellee's trail master to hold the reins in his hand, while all the other riders left their reins on the pommels of their saddles. This mule alone was not safe just to follow the leader.

As the mule attempted to press ahead of its brethren on the "drop side of the canyon" trail, any greenhorn mount, disturbed by the apparently dangerous terrain and untrained in the use of the bit, would haul back with all his strength until he well could hurt the mule's mouth and cause it to resent the pain, as here by bucking or kicking, or some other action dangerous to its rider.

HEALY, Circuit Judge (dissenting).

If the motion made here had been for a directed verdict I would agree that it would be error to grant it. The main opinion —which I confess some difficulty in following—appears to assume that the same principle applies in the case of a motion for a dismissal upon a trial to the court, that is, that the court is obliged to deny the motion if, on the same state of the proof, it would be obliged to deny a motion for a directed verdict in a jury case. The Third Circuit has so held, Federal Deposit Ins. Corporation v. Mason, 115 F.2d 548;

994

Schad v. Twentieth Century-Fox Film Corporation, 136 F.2d 991. This court, however, has heretofore committed itself to a contrary doctrine, Young v. United States, 111 F.2d 823. So also, and more clearly, has the Seventh Circuit, Gary Theatre Co. v. Columbia Pictures Corporation, 120 F. 2d 891.

As is recognized by the authorities last above cited, the situation is governed by Rule 41(b), a rule to which no adequate attention is given by the majority. This provides that "after the plaintiff has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief." Unless the court otherwise specifies a dismissal under this subdivision operates as an adjudication upon the merits. The rule so provides. The judgment of dismissal entered in this instance was unqualified, so that beyond question it operated as a disposition of the case on the merits.

As I understand the holdings in the Young and Gary Theatre cases, supra, in a nonjury case the court, on a motion to dismiss under the above quoted provision of Rule 41(b), applies its own untrammeled judgment to the evidence introduced by the plaintiff. The court, being itself the trier of the facts, is entitled to pass on questions of credibility, to weigh the evidence and to draw inferences from it, notwithstanding other inferences might reasonably be drawn or a contrary conclusion reached by rational minds. I think this is the correct interpretation of the rule, since by its wording the court is called upon to determine, not only the law, but the facts. If, at the close of the plaintiff's evidence, the court has fully made up its mind that the showing is insufficient to warrant recovery, there is no good reason why it should not at that point dispose of the case on the merits. It should, however, make findings as contemplated by Rule 52(a). And findings so made are to stand unless clearly erroneous. See the Young and Gary Theatre cases, supra.

In this instance the trial court made no findings. It was, I think, obliged to do so. It ought also be said that where the case is at all close the better practice is to deny the motion and let the trial proceed in order that a complete picture may be presented in the event of an appeal. It would doubtless have been well to follow that practice here. It is true that the plaintiff went farther than he needed to in his development of the proof, calling, in addition to his own witnesses, two employees of the defendant. These testified to the previous careful training as well as to the prior exemplary conduct of the mule in question. I may add that the trial court displayed no misunderstanding of the law applicable in suits of this nature, and it is plain that the judge believed no substantial case of a failure to exercise reasonable care had been made out.

It may not be out of place to comment briefly on the factual situation as pictured by my associates. There was no showing that the "locale was dangerous" or the trails narrow. The testimony is that Bright Angel trail varies in width from four to six feet. It was not shown nor is it claimed that the circular read by the plaintiff was false in any particular or that the information given plaintiff by the ticket seller was inaccurate or misleading. So far as the proof goes all statements made by the defendant accurately reflected the prior experience of its service.

Of course, unlike the owner of the mule, my associates have the inestimable advantage of hindsight, so that they are able to tell us how the animal would probably perform under the conditions given. I pose as no expert, but I venture to believe that they oversimplify the case. If this mule, soft as were he and his mates after a winter on pasture, were inclined to resent the saddle and to buck, one would expect him to perform while still untired, whereas the testimony is that he had been on the trail nearly four hours before anything untoward happened beyond the occasional display of a tendency to press the mule ahead of him. Chiggers was not the only mule in the string provided with a bridle and reins; the others were similarly equipped. It is to be surmised that in no case was the equipment ornamental, but was intended for use in the customary way as a means of control. A mule is not a machine but a sentient animal, and I suppose that the conduct even of the most tractable of the species is not entirely predictable. Any novice who essays to ride a mule or a horse must realize that the definite risk of being thrown is inherent in the enterprise; and my brothers concede that the law does not hold the renter as an insurer.